**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

RUTH GORDON and ANTHONY ARANGO,
individually and on behalf of all others
similarly situated

PLAINTIFFS

v.                              Case No.: 8:11-CV-2001-VMC-EAJ

CHASE HOME FINANCE, LLC,
JP MORGAN CHASE BANK, N.A. and
JP MORGAN CHASE BANK, N.A. as
successor in interest to Chase Home
Finance, LLC

DEFENDANTS

JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT

Plaintiffs Ruth Gordon and Anthony Arango, acting individually and on behalf of a class of all other persons similarly situated, for their Second Amended Complaint and demand for jury trial state and allege as follows.

**I.      INTRODUCTION AND GENERAL ALLEGATIONS**

1.      Defendants JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC (individually "JPM" and "CHF" and collectively "Chase" or "Defendants") are among the country's largest residential mortgage lenders and loan servicers.[1] The mortgages they service require the borrowers to maintain acceptable flood and hazard insurance on the residential property securing their loans. When borrowers do not obtain insurance coverage in amounts Chase requires, Chase exercises its right to purchase insurance

_____
[1] The two entities merged effective May 1, 2011.

1

for the borrower. This is standard and appropriate. Such purchase of insurance by the lender is commonly known as "force-placement."

2.      What is not standard and appropriate is Chase's exploitative and self-dealing arrangement in the purchase of force-placed insurance. Chase purchases all of its force-placed insurance from a company named American Security Insurance Company ("ASIC"), at a cost two to twenty times the market rate for such insurance. Under written agreements with ASIC, ASIC is the *exclusive* provider of force-placed insurance for Chase. Chase thus agrees not to "shop around" to obtain a fairly priced policy when force-placing borrowers with insurance, and to use only ASIC. Under these written agreements, ASIC contractually agrees to pay a Chase affiliate (Chase Insurance Agency) a kickback equal to ten to twenty percent of the "cost" of the policy.[2] On information and belief, Chase Insurance Agency's only purpose is to receive kickbacks of premiums paid to ASIC.

3.      Chase's insurance-related responsibilities, such as tracking insurance coverage on borrower's properties and sending notices related to insurance coverage issues, are performed by ASIC. Borrowers force-placed into insurance by Chase foot the bill for this outsourcing arrangement by paying exorbitant rates on force-placed insurance that include kickbacks to Chase Insurance Agency.

4.      Chase uses its sister corporation, Chase Insurance Agency, Inc., as the "agent" that gets paid for "finding" the force-placed insurance for Chase and placing it. But there is no "finding" involved. Chase Insurance Agency performs no typical insurance agent services that would entitle an agent to a commission. Chase already

---

[2] Under various revisions of the written agreements, the kickback percentage varied between ten, fifteen, and twenty percent during the period of time covered by this lawsuit.

has written contracts with ASIC where it is agreed that *all* force-placed insurance for Chase will be purchased from ASIC. These agreements provide that ASIC will pay 10%-20% in rebates as "commissions," which are actually just kickbacks. Chase apparently does not even contend that Chase Insurance Agency does anything to *earn* these "commissions." Instead, Chase argues that there is nothing in "Florida's statutory insurance framework that requires CIA to perform some undefined 'agent services'" in order to earn a commission.[3] Chase Insurance has no obligations or duties other than to return commissions to ASIC when ASIC refunds a premium on a force-placed policy to a customer.

5.     Chase charges borrowers' mortgage escrow accounts for the exorbitantly priced flood-insurance policies it purchases, so if the borrower refuses to pay the exorbitant premium she faces the risks of adverse credit reporting, default, and foreclosure. Chase has a fiduciary duty to Plaintiffs and class members with respect to their escrow accounts. The proper purpose of force-placed insurance is to protect the collateral—the lender's security for the loan—from loss. Instead, Chase abuses its right to force-place insurance by force-placing policies in excess of the loan balance at premium rates that include the kickback to Chase.

6.     When customers question the force placed policy limits, Chase replies that it is Chase's policy to require borrowers to carry insurance equal to the replacement value of the collateral—even when the amount of money owed to Chase on the debt is far below the replacement value of the collateral. For example, Plaintiffs were required by Chase to carry $250,000 in flood insurance coverage when the amount of money owed on their loan was only $108,000. This practice is not necessary to protect Chase's

---

[3] Chase's Reply in Support of Its Motion to Dismiss Plaintiff's First Amended Complaint, Doc 54, at 1.

interests. If a loss to the property occurs and Plaintiff has $108,000 in insurance, the proceeds go to pay off the Chase-serviced debt. Such an insurance policy fully protects Chase's interests.

7. Federal law does not require flood insurance in excess of the outstanding balance owed to the lender, but Chase sends deceptive and false notices to borrowers that mislead them into believing that federal law requires more than loan balance coverage.

8. Chase's practices, as alleged in this Amended Complaint, constitute breach of contract, including the implied covenant of good faith and fair dealing, violate the fiduciary duty Chase has with respect to management and use of borrowers' escrow funds, violate the Bank Holding Company Act, are unconscionable, and violate the Truth in Lending Act. Plaintiffs' causes of action are alleged in more detail below.

## II.  PARTIES

9. Plaintiffs Ruth Gordon and Anthony Arango are residents of Hillsborough County, Florida and own their home in Tampa Florida. Ms. Gordon and Mr. Arango refinanced their home with a mortgage from Washington Mutual Bank (WAMU) in 2003. JPMorgan Chase Bank, N.A. acquired the loan in 2008 when it purchased the assets of WAMU. JPM delegated servicing of the loan to its agent, CHF. A copy of the mortgage and promissory note are attached as Exhibits 1 and 2 respectively.

10. Plaintiffs maintained flood insurance exceeding the balance of their first mortgage home loan for years, but in 2011, Chase notified the Plaintiffs that they needed $250,000 in flood insurance coverage. At that time, the balance of their loan was only $108,018.48. Ms. Gordon called Chase and protested Chase's demand for

4

additional coverage, but eventually bought a $250,000 flood insurance policy after Chase force-placed the Plaintiffs into a high-premium policy with ASIC in June of 2011. Ruth Gordon and Anthony Arango ask the Court to appoint them as class representatives, as more fully set out below.

11.     CHF is a Delaware limited liability company that serviced mortgage loans originated or owned by JPM including mortgage loans to Florida homeowners. CHF registered with the Florida Department of State as a foreign corporation conducting business in Florida on February 5, 2005. On May 17, 2011, CHF filed an Application by Foreign Limited Liability Company for Withdrawal of Authority to Transact Business in Florida. In doing so, it appointed the Florida Department of State as its agent to accept service with respect to any cause of action arising during the time it was authorized to transact business in Florida. On or about May 1, 2011, CHF merged into JPM, but CHF's existence continued through at least May 17, 2011, as it was able to act in its own capacity until at least that date. Although CHF has now merged into JPM, Plaintiffs bring this suit directly against Chase Home Finance, LLC pursuant to Fla. Stat. § 607.1106(1)(c) and (d)[4].

12.     CHF and JPM individually, as well as JPM and CHF collectively, engaged

---

[4] F.S. § 607.1106(1)(c) and (d) provide that the surviving corporation after a merger is responsible for all liabilities and obligations of the merged corporation and that any "claim existing or action or proceeding" against the merged corporation may be continued as if the merger did not occur, or the surviving corporation may be substituted in place of the merged corporation. See *Arnwine v. Huntington Nat. Bank, N.A.,* 818 So.2d 621, 624-25 (Fla. 2nd DCA . 2002)(lawsuit against merged corporation for pre-merger claims could be filed against merged entity). Although Chase is incorporated in Delaware, the Florida statute making "the corporation subject to suit after termination or suspension of its existence" will apply. REST 2d Conflicts of Laws, § 299, Comment (f), and authorities cited therein. Florida follows the Restatement. *Grupo Televisa v. Telemundo Commc'ns Group, Inc.,* 485 F.3d 1233, 1240-41 (11th Cir. 2007).

in all actions complained of by Plaintiff in this Amended Complaint to the extent that such actions occurred prior to the merger of the two entities. CHF is named as a separate individual defendant with respect to its individual actions prior to the merger.

13. Because of the merger of CHF into JPM, JPM is legally liable for the conduct of CHF at issue in this Complaint. Fla. Stat. § 607.1106. JPM is named in its capacity as "successor in interest" to CHF because that is how it has referred to CHF in other lawsuits filed against CHF after the merger. The claims made against JPM as CHF's successor in interest are not claims against JPM individually. CHF and JPM, as successor in interest to Chase, are referred to collectively as CHF in this Complaint.

14. Defendant JPM is a national banking association that does business in Florida and several other states throughout the United States. JPM is named in its individual capacity, and is responsible for all actions complained of herein, at all times relevant to this action.

15. All defendants have been previously and properly served in this action in accordance with all requirements of applicable law.

16. Plaintiffs have performed all contractual conditions precedent prior to bringing this claim or, alternatively, such conditions precedent have been waived or would have been futile. The recent deposition testimony of a Chase Vice President established that even if Plaintiffs had given written notice of complaints about Chase's demands for additional insurance, Chase would not have made any exception to its practices.

## III.    JURISDICTION AND VENUE

17. Substantial acts giving rise to the causes of action asserted herein

occurred in this State and within this venue.

18.     Jurisdiction is proper in this Court because class representatives Ruth Gordon and Anthony Arango reside in the city of Tampa, Florida, and all proposed class members are citizens of Florida or own property in Florida, and are protected by the statutory and common law of this state.

19.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2) ("CAFA"). Plaintiffs are citizens of the State of Florida. Other class members are citizens of States other than Florida, but own property in Florida. JPM is a citizen of a state other than Florida, as its main offices are located in New York and Chicago. The amount in controversy exceeds $5,000,000.

20.     This Court has subject matter jurisdiction over Plaintiffs' claims arising under the Bank Holding Company Act, 12 U.S.C. § 1972 according to the statute's jurisdictional statement in 12 U.S.C. § 1975. All other claims arose out of the same transaction or occurrence so as to make them part of the same constitutional case. Therefore, this Court has subject matter jurisdiction over all of Plaintiffs' claims.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, and a substantial part of the property that is the subject of this action, are located in this District.

## IV.    FACTS

### a.    Facts as to Plaintiffs Ruth Gordon and Anthony Arango

22.     As of July 8, 2011, Ruth Gordon and Anthony Arango's principal balance on their mortgage was $108,018.48.

23.     In 2010, the replacement cost of Ruth Gordon and Anthony Arango's home was valued at $185,000.

24.     Prior to 2011, Ruth Gordon and Anthony Arango maintained $189,000 in flood insurance through a company named Harleysville. This insurance policy named JPMorgan Chase Bank, N.A. as the first mortgagee on their property and a beneficiary, up to the outstanding balance on their mortgage. This flood insurance coverage was significantly greater than the amount of insurance required to protect JPM's interest ($108,018.48—the loan balance), and $4,000 more than necessary to cover the full replacement cost of the home. The premium for this policy was $929 per year.

25.     Since the Plaintiffs' $189,000 flood policy more than insured JPM's insurable interest in the property, Chase could have no rational basis to require Ms. Gordon and Mr. Arango to maintain any additional flood insurance.

26.     In 2011, Ms. Gordon and Mr. Arango changed hazard insurance companies, and the new hazard insurance company provided them with a $388,200 hazard insurance policy. Plaintiffs' flood insurance policy effective July 11, 2011 reflects a replacement cost value for the property of $207,900.

27.     Chase sent Ms. Gordon and Mr. Arango a letter on April 22, 2011 stating that "[t]he Flood Disaster Protection Act of 1973 requires that flood insurance is purchased and maintained for the life of the loan when the secured property is located in a Special Flood Hazard Area (SFHA)." This letter further stated that the insurance policy must be equal to the lowest of (1) the full replacement cost of the dwelling and insurable improvements, (2) $250,000, or (3) the unpaid principal on the mortgage, if it

is at least 80% of the full replacement cost of the dwelling and insurable units. This is a misrepresentation of the amount of flood insurance required by federal law.

28.     Chase's April 22, 2011 letter concluded that federal law required Ms. Gordon and Mr. Arango to obtain $61,000 in additional flood insurance, which would bring their total insurance coverage to $250,000. This amount is more than $140,000 greater than Chase or JPM's interest in the property or risk of loss in the event of a flood, and more than $40,000 greater than the total insurable value of Ms. Gordon and Mr. Arango's home.

29.     Chase's April 22, 2011 letter stated that if Plaintiffs did not obtain the excess coverage demanded that Chase would purchase insurance for them. The letter stated that if Chase purchased the insurance the cost "might" be more than Plaintiffs would pay if they bought the insurance themselves.

30.     Chase then obtained a force-placed insurance binder provided by ASIC, on Ms. Gordon and Mr. Arango's property, notifying them by letter dated May 13, 2011. This insurance binder included coverage of $61,000 and was effective from June 11, 2011 through July 26, 2011 at an annual premium of $563.83.

31.     On July 15, 2011, Chase sent Ms. Gordon and Mr. Arango a letter stating that Chase had purchased $61,000 in flood insurance for their property from ASIC. Although this flood insurance policy was only in effect for approximately one and a half months, Chase charged Ms. Gordon and Mr. Arango the full annual cost of $563.83 for one and a half months of coverage. $549 of this amount was paid to ASIC as premium, and ASIC paid $54.90 of this amount back to Chase as a "commission." Chase funded the insurance premium by creating an escrow account for Plaintiffs' mortgage and

withdrawing sums from the newly created escrow account. Chase then applied Ms. Gordon's mortgage payments, which she had been overpaying to reduce her mortgage debt, to fund the escrow deficiency.

32.     To get out from under Chase's force-placed coverage, Ms. Gordon and Mr. Arango purchased a new flood insurance policy providing $250,000 in coverage, effective July 11, 2011. The premium for this flood insurance policy was $1,187 per year.

33.     To increase their coverage to $250,000, Plaintiffs spent only $258 more than they spent on their prior $189,000 flood insurance policy. This means that they paid one dollar for every $236.44 in coverage. Chase's force-placed policy was more than twice as expensive as the policy Plaintiffs purchased for the same amount of coverage and provided only $108.18 in coverage for each dollar paid.

34.     Notwithstanding Ms. Gordon and Mr. Arango's purchase of $250,000 of flood insurance—the National Flood Insurance Program's maximum—Chase force-placed Ms. Gordon and Mr. Arango into yet another flood insurance policy, sending notice to Ms. Gordon and Mr. Arango of its purchase on July 15, 2011. This flood insurance policy provided $42,100 in coverage, and charged an annual premium of $379 plus fees bringing the total payment to $387.72 per year. Chase withdrew $387.72 from Plaintiffs' newly created escrow account, paying $379 in premiums to ASIC, which paid $37.90 to Chase as a "commission." Again, the cost of this coverage was more than twice what Ms. Gordon and Mr. Arango paid for insurance with better coverage. JPM's correspondence provides no indication of how JPM determined Ms. Gordon and

Mr. Arango needed $42,100 in insurance in addition to the $250,000 policy the Plaintiffs purchased to avoid Chase's first force-placement.

35.     Any flood insurance in addition to Ms. Gordon and Mr. Arango's $250,000 flood insurance policy is worthless because the National Flood Insurance Program will not pay more than $250,000 for any flood loss.

36.     Prior to Chase's decision to force-place flood insurance on Ms. Gordon and Mr. Arango's property, Ms. Gordon and Mr. Arango's mortgage did not have an escrow account associated with it. Chase established an escrow account for the sole purpose of withdrawing the force placed insurance premiums. Ms. Gordon and Mr. Arango received a statement dated July 8, 2011 that demonstrates that JPM charged them the full $563.83 annual premium for JPM's first force-placed insurance policy, which was in effect for less than two months.

37.     Chase ultimately refunded some of the money charged for the force-placed insurance, except that Plaintiffs were charged for the premium of one month of insurance where Chase deemed there to be a "gap" between the amount of coverage that Plaintiffs carried and the amount Chase required. Plaintiffs were charged $45.22 for one month of force-placed insurance that provided $61,000 in coverage. When Plaintiffs purchased an additional $61,000 in insurance to meet Chase's demands, it only cost them $21.50 a month. The insurance force-placed by Chase and charged to Plaintiffs' escrow account cost more than twice as much. Chase charges these excessive premiums to the escrow accounts of thousands of Class Members each month – and ten to twenty percent of the money is passed back to Chase in the form of "kickbacks" that Chase describes as "commissions".

b.     **Facts and Allegations as to Defendants**

38.     Chase, American Security Insurance Company, and Chase Insurance Agency, Inc., are engaged in a scheme designed to unfairly and deceptively reap excessive and unconscionable fees from borrowers in connection with force-placed flood insurance.

39.     Chase Insurance Agency, Inc. ("Chase Insurance"), formerly named JPMorgan Insurance Agency, is a company wholly owned by JPM's parent company, JPMorgan Chase Co.

40.     Chase exercised substantial control and influence over the operation of Chase Insurance.

41.     Chase Insurance was the agent of Chase with respect to all actions on the part of Chase Insurance detailed in this Second Amended Complaint.

42.     Beginning January 1, 2007, and continuing through the present, Chase has been a party to a series of contracts with ASIC. These contracts provide that ASIC is the exclusive company for issuing all force-placed insurance in connection with loans serviced or owned by Chase, and that Chase Insurance is an agent for ASIC.

43.     In exchange for Chase agreeing to use ASIC exclusively for all force-placed policies, ASIC pays Chase Insurance a "commission" of ten to twenty percent of the policy premiums.

44.     Chase Insurance does nothing to earn this "commission." It does not seek competitively priced insurance policies or perform any other acts to "earn" a commission. Rather, in exchange for Chase agreeing to refer all of its force-placed insurance policies to ASIC, Chase Insurance receives a rebate of a portion of the

premium cost. This is a kickback.[5] Chase Insurance is set up merely to serve as a conduit for Chase to receive this kickback.

45.     The arrangement between Chase Insurance and ASIC is such that a competitively priced insurance policy is not actually "found" for any given property. Rather, there is a pre-set arrangement where Chase, through its agent, Chase Insurance, binds itself to purchase all force-placed insurance from ASIC. The cost of the insurance bears no relation to each homeowner's individual home; rather, it is pre-determined based on Chase's entire portfolio of mortgages.

46.     ASIC charges an exorbitant amount for insurance coverage. The charges imposed on customers for the coverage are many times the market rate for insurance providing the same coverage.

47.     Paragraph five of Plaintiffs' mortgage states that if the lender is required to force-place insurance, the cost of any force-placed insurance "might significantly exceed" the cost of insurance the borrower could have purchased, and that Chase may purchase force-placed insurance "by or from" an affiliate, and that the affiliate might receive "consideration" for the "purchase" of such insurance. But Chase Insurance has no role whatsoever in the purchase of force-placed insurance and provides no services directly to borrowers during the purchase of force-placed insurance. Moreover, Chase does not disclose the "cost" of the kickback paid to Chase Insurance pursuant to its secret agreement.

48.     Chase is aware of all details of the contractual agreements between Chase Insurance and ASIC. Chase knows that since the contracts predetermine that all

---

[5] Black's Law Dictionary (9th ed. 2009) defines "kickback" as the "return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement."

13

force-placed insurance will be placed with ASIC and the cost of the insurance will be at a rate determined by ASIC rather than the market, there is no role for an "agent" to earn a "commission" on the placement of such insurance. Knowing that the cost of the insurance is exorbitant, and knowing that its sister company Chase Insurance receives kickbacks for each policy placed, Chase uses Chase Insurance as its exclusive "insurance agent" in connection with force-placed policies.

49.     The force-placed insurance market is extremely lucrative and generates high profit margins. ASIC's parent company, Assurant Inc., collected $2.7 billion in premiums in 2010 through its force-placed division alone. Assurant only paid out claims equaling 36% of this take—though with the Company's other lines of business, a 70% claims-to-premiums ratio is the norm. Forty percent of the $2.7 billion in revenue is consumed by "general expenses," largely kickbacks to banks and their affiliates described as "commissions." In other lines of insurance, overhead and expenses are usually a fraction of policyholder claims.

50.     These practices have recently come under fire by all fifty State Attorneys General as part of a nationwide investigation. As the State Attorneys General have recognized, this practice has greatly contributed to the foreclosure crisis.

51.     Borrowers, like Plaintiffs, are required to establish an escrow account to pay the premiums on force-placed insurance.

52.     Chase has a fiduciary duty to Plaintiffs and other borrowers with respect to funds in the borrowers' escrow accounts.

53.     Chase violates its fiduciary duty to Class Members through its practice of withdrawing money from borrowers' escrow accounts to pay for exorbitantly priced

insurance from ASIC, knowing that part of the price of the insurance reflects sums paid to a Chase affiliate as a kickback.

54.     Chase does not pay interest to borrowers on the funds held in their escrow accounts for the purpose of making these insurance payments.

55.     Chase's scheme provides an incentive for ASIC and Chase Insurance to purchase the highest priced force-placed insurance policy The higher the cost of the policy, the greater the kickback to Chase's and its affiliate.

56.     Under the written agreements with ASIC, ASIC monitors all Chase borrowers to identify the homeowner's insurance coverage, lapses in coverage, and flood insurance status.  ASIC sends letters to Chase borrowers, on Chase letterhead, notifying the borrower of Chase's insurance coverage demands. Through the payment of the kickbacks hidden in the flood insurance premiums, borrowers pay the cost of these outsourced services that Chase is not permitted to charge to the borrower.

57.     The "premiums" for insurance that are charged to the Plaintiffs are illegal because they include not only the excessive cost of insurance but also include illegal kickbacks and the cost of the bundle of administrative services that ASIC/Assurant provide to Chase.

58.      Plaintiffs and the class have no way of refusing Chase's demands for excess insurance.  Unless the borrower purchases additional unnecessary insurance, she cannot avoid the excessive charges for force-placed insurance.

59.     The charges for force-placed insurance are not determined on a competitive basis and are well in excess of rates available in the open market to Chase,

15

Plaintiffs, or the Class.  Chase undertakes no good faith, arms-length transactions in the purchase of forced placed insurance.  Chase has a duty to act in good faith.

60.     The actions and practices of Defendants described herein are in bad faith and are unconscionable. Even if the terms of the mortgage could be construed to allow this conduct, such actions and practices are an abusive and unlawful use of Defendants' contractual authority. Chase's conduct violates both State and Federal law.

61.     Defendants' manipulation of force-placed insurance purchases has maximized the profits to themselves and their related companies to the great detriment of Plaintiffs and the class.

62.     Defendants are not authorized by any law, contract, or agreement to manipulate their force-placed insurance purchases in bad faith as alleged above.

63.     In mid-2007, Chase changed its policies and began to require borrowers to carry more flood insurance than required by Federal law. Before this policy change, borrowers like Plaintiffs were not required to carry flood insurance in excess of the balance of their mortgage debt, which is sufficient coverage under Federal law. Beginning in 2007, Chase began requiring borrowers like Plaintiffs—whose mortgage balances were well below the replacement value of their properties—to carry replacement value coverage.

64.     Under Chase's new policy, Chase does not make individual determinations of the replacement value of a borrower's property. Instead, Chase uses the amount of hazard insurance coverage carried by the borrower as a proxy for replacement value. The result of Chase's policy is that the borrower is required to carry

an amount of flood insurance at least equal to 80% of the replacement value of their property—regardless of their loan balance.

65.     Plaintiffs were advised by Chase that they would be required to carry $250,000 of insurance coverage even though the debt on their property was approximately $108,000.

66.     With respect to condominiums, Chase's new policy required 100% replacement value coverage, and the policy change for condominiums became effective in December 2009. Other than this policy for condominiums, there are no differences in Chase's policy towards single-family homeowners, borrowers in duplexes or mobile homes, and condominium borrowers.

67.     Plaintiffs' mortgage and the mortgages of Class Members provide that the lender is to be named as loss payee on the insurance policy to the extent of the balance on the mortgage. That is the extent of the interest Chase has to protect. Chase's requirement of insurance in excess of that amount is bad faith.

68.     The force-placed insurance policies issued to Plaintiffs and Class Members name Chase and Plaintiffs/Class Members as loss-payee "as their interests may appear." The extent of the lender's right to proceeds from such a policy in the event of a loss is the balance of the loan obligation. Chase's requirement of insurance in excess of that amount is bad faith.

     c.     **Summary of Facts Supporting Class Action Treatment**

69.     Chase's policy of requiring flood insurance coverage in excess of the balance on borrowers' loans is a written policy applied to all borrowers.

70.     Chase's representations to Plaintiffs about federal flood insurance

requirements are untrue and misleading. Chase used form letters to make identical misrepresentations to Class Members in the same or similar situations.

71.     Chase is contractually obligated to purchase all flood insurance force-placed on Class Members from the same company, ASIC, and the kickback scheme is applied in a uniform manner.

72.     The percentage of insurance premium that is paid as a kickback to Chase during the class period is set forth in specific written contracts with ASIC. During the term of the different contracts, kickbacks were set at twenty percent for one period, fifteen percent during another period, and ten percent during another

73.     Ruth Gordon and Anthony Arango continue to pay for the flood insurance coverage in excess of their loan balance, and they continue to receive notices threatening further force-placement. Chase uses standardized practices to force thousands of homeowners to pay for unnecessary flood insurance at exorbitant prices.

74.     It is easy to identify Class 1[6] members because the database of Chase and/or its agents will detail all Class Members force-placed with flood insurance during the class period.

75.     It is easy to identify Class 2 members because the database of Chase and/or its agents will detail all Class Members required to carry flood insurance coverage in excess of their mortgage balances.

76.     Chase monitors flood insurance coverage on all Class Members through a detailed computer database containing all relevant information about the extent of coverage for all Class Members' properties during the class period. This database may

---

[6] Proposed classes 1 and 2 are defined on the following page (p. 19).

be jointly maintained by ASIC and Chase. Class members also have this information.

77.     Flood insurance policies force-placed on Class Members were from ASIC

and were uniform.

78.     Class members could not justify the expense of litigating the issues herein

individually given the amount of each class member's individual damage claim.

## V. CLASS ALLEGATIONS

### a. Class Definition

79.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly

situated. Plaintiffs seek to represent the following classes:

> Class 1: All United States residents with mortgages owned or serviced by
> JPMorgan Chase Bank, N.A. or Chase Home Finance, LLC who, during the
> applicable statute of limitations, were charged for a force-placed flood insurance
> policy, and who, at any time, paid, or who still owe, premiums for such force-
> placed policies.

> Class 2: All United States residents with mortgages owned or serviced by
> JPMorgan Chase Bank, N.A. or Chase Home Finance, LLC who, during the
> applicable statute of limitations, increased their flood insurance coverage to an
> amount exceeding the unpaid principal balance of their mortgage loan after
> receiving notice from JPMorgan Chase Bank, N.A. or Chase Home Finance, LLC
> stating that their existing flood insurance coverage was insufficient.

80.     Excluded from these classes are Defendants, their affiliates, subsidiaries,

agents, board members, directors, officers, and employees, and Plaintiffs' counsel.

81.     Plaintiffs reserve the right to modify or amend the definitions of the

proposed class before the Court determines whether certification is appropriate.

82.     Defendants subjected Plaintiffs and the respective Class members to the

same unfair, unlawful, and deceptive practices and harmed them in the same manner.

The conduct described above is the Defendants' standard and undisputed business

practice.

**b. Numerosity**

83.    The individual class members are so numerous that joinder of all members is impracticable. The Defendants sell and service millions of mortgage loans and insurance policies in the state of Florida and nationwide. Chase's corporate representative has testified that Chase services over 300,000 loans in flood zones and that approximately 11% of those have force-placed flood insurance. The number that has had force-placed flood insurance at any point during the class period will be far greater. Current force-placed Class Members alone would exceed thirty thousand. A large portion of these will be from Florida because, out of approximately 5.5 million flood insurance policies in the U.S., approximately 2.2 million are in Florida. The individual class members are ascertainable as the names and addresses of all class members can be identified in the business records maintained by the Defendants. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**c. Commonality**

84.    There are questions of law and fact that are common to the Plaintiffs' and Class Members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

**1.    Force-Placed Class**

a.    Whether Chase breached Class Members mortgage contracts and the implied covenant of good faith and fair dealing by charging Class Members for the "costs" of force-placed flood insurance when a portion of those "costs" were returned to a Chase affiliate pursuant to a secret agreement.

b.    Whether Chase breached its fiduciary duty to Plaintiffs and Class Members by withdrawing funds from their escrow accounts for the purported

"cost" of flood insurance when Chase knew that a portion of those funds would be paid to Chase's affiliate as a kickback;

c.      Whether Defendants breached the mortgage contracts, the implied covenant of good faith and fair dealing, and acted unconscionably towards Plaintiffs and Class Members by failing to seek competitive bids on the open market before purchasing force-placed flood insurance for Class Members;

d.      Whether Defendants breached their fiduciary duty to Plaintiffs and Class Members with respect to management of funds held in escrow accounts when Defendants made no attempt to obtain competitive rates when purchasing force-placed flood insurance, instead purchasing all such insurance from a single insurer at exorbitant rates that included the cost of a kickback paid to a Chase affiliate;

e.      Whether Chase's business practices for force-placed insurance are unconscionable as Chase applies them; specifically, whether the mortgage provisions relating to force-placed flood insurance are procedurally and substantively unconscionable to the extent Chase claims they authorize Defendants to derive hidden financial benefits by force-placing high-cost insurance policies when a portion of the "costs" of those policies are returned to a Chase affiliate;

f.      Whether Chase violated TILA by conditioning its extension of credit on the borrowers purchasing flood insurance through its affiliate, in direct contravention of the anti-coercion disclosures included with borrowers', including Plaintiffs' mortgages;

g.      Whether Chase violated TILA by failing to disclose kickbacks paid to CIA and charged to Class Members in its mortgages;

h.      Whether Chase violated TILA when it changed the terms of Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance coverage in excess of the amount authorized by the mortgage, which is Chase's interest in the property;

i.      Whether Chase violated the anti-tying provisions of the Bank Holding Company Act by tying its agreement to purchase flood insurance on behalf of Class Members and its continuing extension of credit, on Class Members agreeing that Defendant will purchase insurance by or through its affiliate; and

j.      Whether Chase's tying practices had an anti-competitive effect on the interstate flood insurance market in violation of the Bank Holding Company Act.

### 2.      Excess Insurance Class

a.      Whether Chase's uniform flood insurance requirements for borrowers exceeded the amount necessary to protect its interest in the secured collateral;

b.      Whether Defendants' policy of requiring flood insurance in excess of the amount of the borrower's loan was unconscionable or a breach of their legal obligations to Class Members;

c.      Whether Chase breached Class Members' mortgage contracts and the implied covenant of good faith and fair dealing by requiring flood insurance in amounts greater than the amount authorized by Class Members' mortgages, which is the amount necessary to "cover Lender . . . against any risk;"

d.      Whether Chase's application of Plaintiffs' and Class Members' mortgage language, specifically its policy of requiring flood insurance coverage in amounts exceeding its interest in a borrower's property (the borrower's outstanding loan balance), is unconscionable;

e.      Whether Chase's uniform policy of applying its flood insurance policy to all borrowers and providing borrowers no opportunity to prove that their coverage is sufficient or negotiate with Chase is unconscionable;

f.      Whether Chase violated TILA by failing to accurately disclose its flood insurance requirements; and

g.      Whether Chase's form letters to Plaintiffs and Class Members violated TILA by misrepresenting Plaintiffs' and Class Members' obligations under their mortgages.

#### d. Typicality

85.      Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of the unlawful conduct of Defendants. Each class member has sustained and will continue to sustain damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

#### e. Adequacy of Representation

86.      Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous

prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

87.     The law firms representing Plaintiffs are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**f. Requirements of Fed. R. Civ. P. 23(b)(3)**

88. The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class Members are based on the force-placed insurance policies that Defendants unlawfully secured from the same company under the same common scheme, and their deceptive and egregious actions involved in securing the force-placed policy.

89.     Common issues predominate when, as here, liability can be determined on a classwide basis, even when there will be some individualized damages determinations.

90.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and, if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**g**. **Superiority**

91.     A class action is superior to individual actions in part because of the non-

exhaustive factors listed below:

(a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the United States;

(b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions, yet if the action is not prosecuted, Defendants will continue their wrongful actions;

(c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**h. Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

92.     Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

93.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory

relief with respect to the Class as a whole.

## VI.   CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT

94.     Plaintiffs' mortgage deed of trust, along with specific disclosures relating to flood insurance and force-placed insurance, is attached hereto as Exhibit 1. Section five of Plaintiffs' mortgage provides that if Plaintiffs fail to maintain insurance coverage in the "amounts…that Lender requires" that "Lender may obtain insurance coverage." It provides that "Lender may purchase such insurance from or through any company agreeable to the Lender including, without limitation, an affiliate of Lender, and Borrower acknowledges that Lender's affiliate may receive consideration for such purchase." Finally, the section provides that the "cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained."

95.     Kickbacks are not "costs." Chase breached the mortgage contract by charging Plaintiffs for the "cost" of force-placed flood insurance when a portion of this "cost" was returned to a Chase affiliate pursuant to secret agreements between Chase, ASIC, and Chase Insurance Agency, Inc. At a minimum, whether the "cost" of the insurance authorized by the mortgage includes the amount of the kickback is a question of fact.  Chase breached the mortgage agreement by paying its affiliate a "commission" when its affiliate provided no services to Plaintiffs and had no role in the purchase of force-placed insurance for Plaintiffs; in other words, Chase did not purchase force-placed insurance "from or through" Chase Insurance Agency, Inc.

96.     Chase breached the terms of the mortgage contract by using Plaintiffs'

escrow funds for payment of an unearned "commission" to its affiliate, Chase Insurance Agency, when Chase Insurance performed no agent services in exchange for the payment. The contract authorizes payment of "consideration" to a Chase affiliate in connection with force-placed insurance. Consideration requires a *quid pro quo*. That is, the affiliate must actually *do* something to earn the commission. The contract does not authorize Chase to simply give borrowers' money away to its affiliates.

97.     The terms of the mortgage define the charges that Chase may impose upon the Plaintiffs in connection with the contract. Chase breached the contract by imposing charges for kickbacks paid to an affiliate for services as an insurance agent in connection with force-placed insurance when no agent services were performed.

98.     Section 5 of the mortgage states that any force-placed insurance "shall cover Lender...against any risk, hazard or liability..." The third paragraph in Section five of the mortgage contract states "[a]ll insurance policies required by Lender and renewals of such policies shall...include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance." A reasonable construction of these provisions is that Chase is not entitled to insist on insurance coverage in excess of that required to "cover" its interests or in an amount exceeding the "outstanding loan balance." That is the extent of Chase's insurable interest. Chase breached the contracts of Class Members by requiring coverage exceeding the outstanding loan balance.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

99.   Plaintiffs repeat all preceding paragraphs of this Second Amended Complaint.

100.   The implied covenant of good faith and fair dealing is a part of every contract. While the implied covenant cannot override an express contractual term, it attaches to the performance of a specific contractual provision. The duty to act in good faith limits one party's ability to act in a manner that contravenes the reasonable expectations of the other party.

101.   Good faith and fair dealing, in connection with the discharge of performance and other duties according to contractual terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

102.   Section 5 of the mortgage warns that the "cost" of force-placed insurance may significantly exceed the cost of insurance the borrower could obtain. A reasonable borrower would understand that coverage on a borrower who was delinquent on his mortgage obligation for not carrying flood insurance might be more expensive due to the higher risks associated with insuring the homes of delinquent borrowers. It would not, however, be reasonably expected that the "cost" would be two to twenty times more expensive due to self-dealing and profiteering engaged in through contractual arrangements between the lender, its affiliates, and the company providing the policy. "Costs" should also not be construed to include kickbacks to the lender and its affiliates.

103.   Although Section 5 of the standardized residential mortgage authorizes Chase to charge Plaintiffs for force-placed flood insurance, this provision is not a license to steal. It is not a license for Chase to pay itself a kickback under the guise of a

27

"commission" (in an amount or percentage that is never disclosed to the borrower) when the "agent" receiving this "commission" does nothing to earn it. Here, Chase Insurance does not perform any duties one would normally expect for an insurance agent to perform in finding suitable insurance. It is merely a conduit for a setup deal: Chase buys all its force-placed insurance from Assurant/ASIC at inflated rates. Assurant/ASIC then kicks back ten to twenty percent of the "cost" of this insurance to Chase Insurance. Chase Insurance exists for no purpose other than to be the vessel into which these kickbacks are poured, on a monthly basis, pursuant to agreements between Chase and Assurant and Chase Insurance and ASIC. No reasonable consumer would expect that this is how a lender would go about obtaining insurance to "cover" its interests (as the mortgage states). Chase is doing much more than "covering" its interests; it is engaging in a massive rip-off of consumers.

104.   Section 5 of the mortgages state that force-placed insurance will "cover" the lender. A reasonable borrower would not interpret that to mean that Chase would force-place insurance coverage in amounts far in excess of that necessary to "cover" the lender's interests—the balance owed on the loan. Force-placing insurance in excess of the loan balance is an express breach of this term of the mortgage contract.

105.   Plaintiffs and Class Members have suffered and continue to suffer damages as a result of Defendants' breach of the contract and its implied covenant of good faith and fair dealing.

## COUNT III

## BREACH OF FIDUCIARY DUTY

106.   Plaintiffs repeat all preceding paragraphs of this Second Amended

Complaint.

107. Defendants owed Plaintiffs a fiduciary duty with respect to the funds held in their escrow account.

108. In their capacity as escrow agent, Defendants had a duty to be impartial as to the interests of Class Members and Defendants when dealing with the funds in Class Members' escrow accounts.

109. The purpose of funds in Plaintiffs' and Class Members' escrow accounts was to pay for flood insurance force-placed by Defendants.

110. Pursuant to Section 5 of the mortgage agreements, the purpose of force-placed insurance was to "cover" the interests of the lender.

111. Defendants breached their fiduciary duty to Plaintiffs and Class Members by paying funds from their escrow accounts to purchase force-placed insurance at two to twenty times the market rate solely for the purpose of maximizing their own profit and the profit of their agents and affiliates.

112. Defendants acted contrary to the mortgage agreements and breached their fiduciary duty to Plaintiffs and Class Members when Defendants used escrow funds to purchase more flood insurance than necessary to "cover" the lender's interests. This occurred with respect to Plaintiffs and Class Members who were required to carry flood insurance coverage in excess of the balance of their loans.

113. Plaintiffs and Class Members have suffered and continue to suffer damages through Defendants' described lack of impartiality (self-dealing) and wasteful application of their escrow funds.

## COUNT IV

## <u>DECLARATORY JUDGMENT</u>

114.   Plaintiffs repeat all preceding paragraphs of this Second Amended Complaint.

115.   12 U.S.C. § 1972(b) (the "Bank Holding Company Act") prohibits a bank from extending credit on the condition or requirement that the customer shall obtain some additional credit, property, or service from such bank, the holding company of the bank, or a subsidiary of the holding company of a bank.

116.   Florida Statute § 626.9551 provides that "[n]o person may make an extension of credit …on the condition or requirement that the customer obtain insurance from that person, or a subsidiary or affiliate of that person…."

117.   Plaintiffs' mortgages contain one sentence in Section 5 that is unenforceable and void as against public policy based on the Federal and State law referenced. This sentence concerns force-placed insurance on Plaintiffs' property and states that lender "may purchase such insurance from or through any company acceptable to Lender including, without limitation, an affiliate of Lender, and Borrower acknowledges and agrees that Lender's affiliate may receive consideration for such purchase."

118.   Chase Insurance Agency, Inc. is, and its predecessor, JPMorgan Insurance Agency, Inc. was, a subsidiary of JPMorgan Chase & Co., JPMorgan Chase Bank, N.A.'s holding company.

119.   The provision quoted above violates both the Bank Holding Company Act and Fla. Stat. §626.9551, because the condition that the lender be allowed to force-

place flood insurance by or through its holding company's subsidiary, and charge the borrower for it, is a condition of the extension of credit.

120.    The provision in question is void as against public policy. Pursuant to the Florida Declaratory Judgments Act, Fla. Stat. § 86,021, this Court should enter a declaratory judgment that this provision in Plaintiffs' mortgage, and in the mortgages of other class members, is void and unenforceable.

## COUNT V

### VIOLATION OF THE ANTI-TYING PROVISIONS OF THE BANK HOLDING COMPANY ACT, 12 U.S.C. §1972 *et seq*

121.    Plaintiffs repeat all preceding paragraphs to this Second Amended Complaint.

122.    JPM's kickback scheme violates the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972, *et seq.*

123.    12 U.S.C. § 1972(b) (the "Bank Holding Company Act") states "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement…(B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company."

124.    JPM's holding company is J.P. Morgan Chase & Co.

125.   Chase Insurance Agency, Inc. is, and its predecessor JPMorgan Insurance Agency, Inc. was, a wholly owned subsidiary of J.P. Morgan Chase & Co.[7] (Chase Insurance Agency, Inc. and JPMorgan Insurance Agency, Inc. are referred to collectively as "Chase Insurance.")

126.   JPM's purchase of insurance on borrowers' behalf is a service JPM offers to its borrowers. To accept this service, borrowers must agree to pay commissions to Chase Insurance for unidentified services.

127.   JPM, Chase Insurance, and ASIC entered into contractual arrangements under which Chase Insurance would act as the "broker" or "agent" for 100% of force-placed insurance policies purchased on behalf of JPM's borrowers. Under these agreements Chase Insurance received a guaranteed commission for every force-placed insurance policy procured on behalf of JPM's borrowers equal to 10% or 20% of the premium for each policy.

128.   Chase Insurance does not engage in any insurance broker or agent services. For example, it does not seek out competitive insurance policies from different insurance providers, but refers all force-placed insurance business to ASIC.

129.   This is an "unusual" banking practice. Specifically, JPM's exclusive purchase agreement with ASIC obviates any opportunity for Chase Insurance to earn a commission. Plaintiffs are unaware of any other bank with a similar exclusive purchasing arrangement, and are aware that other banks enter into non-exclusive

---

[7] Chase Insurance Agency, Inc. is a subsidiary of J.P. Morgan Insurance Holdings, L.L.C., which is a subsidiary of JPMorgan Chase & Co. JPMorgan Insurance Agency, Inc. was a subsidiary of Chase Bank USA, N.A., which was a subsidiary of CMC Holding Delaware, Inc., which was a subsidiary of J.P. Morgan Equity Holdings, Inc., which was a subsidiary of JPMorgan Chase & Co. Under the Bank Holding Company Act, each company was a subsidiary of JPMorgan Chase & Co. 12 U.S.C. § 1841(g) 12 C.F.R. § 225.2(o).

purchase arrangements with multiple insurance companies for force-placed insurance. For example, one of the nation's five largest mortgage servicers, like JPM, purchases force-placed insurance for its borrowers. However, unlike JPM, this bank entered into non-exclusive insurance purchase agreements with several insurance providers, and the insurance agent that purchases those policies has several options to choose from when selecting a force-placed insurance policy for a borrower.[8]

130.    Defendants' practices are anti-competitive:

(a)    JPM, and ASIC refer all force-placed insurance agency business to Chase Insurance and guaranty Chase Insurance's commissions. The commissions paid to Chase Insurance are based on contracts between JPM and ASIC, not on any services actually provided by Chase Insurance. Chase Insurance has no competitive incentive to provide any services on behalf of borrowers.

(b)    JPM unilaterally sets the commission amount that Chase Insurance will receive. The substantial revenues ASIC receives in premiums from JPM's borrowers gives it an incentive to agree to any commission rate JPM demands for Chase Insurance.

(c)    JPM's tying arrangement results in unreasonably high commissions to Chase Insurance. The commissions are a percentage of ASIC's premiums. ASIC provides more limited insurance policies than borrowers can obtain on the market but cost more than twice as much as other policies the borrowers would obtain on the open market. JPM's agreements allow Chase Insurance to receive more than twice the commission any other insurance agent could receive for procuring more limited insurance than any other insurance agent would procure.

(d)    Unlike regular insurance agency arrangements, JPM utilizes its power as borrowers' mortgage lender to guaranty payment of Chase Insurance's commissions. JPM withdraws insurance premiums and commissions directly from borrowers' escrow accounts to pay commissions to its holding company's subsidiary, Chase Insurance. If borrowers refuse to make increased payments to their escrow account, JPM coerces them into doing so with

---

[8] Plaintiffs are unable to elaborate further, because Plaintiffs' counsel obtained this information in discovery in a related case, subject to a confidentiality agreement.

negative credit reporting and, potentially, foreclosing on their homes. JPM use its power as borrowers' bank to steer commissions to Chase Insurance.

(e)    In cases like Plaintiffs', wherein the borrower immediately obtains insurance in response to JPM's demands to do so, JPM further guarantees commission payments to Chase Insurance by reserving sole discretion to define any portion of the commission as "earned." For example, when Plaintiffs obtained flood insurance to meet JPM's requirements, JPM determined that $45.00 of the premium was "earned" and simply refused to return this portion of the premium to Plaintiffs. Chase Insurance kept 10% of this "earned" premium. JPM used its control of funds in Plaintiffs escrow account—its power as a bank—to steer commissions to Chase Insurance.

(f)    JPM's force-placed insurance arrangement usurps market share from other insurance agencies in favor of Chase Insurance. Force-placed insurance may be a more costly option than purchasing insurance on the open market, but it is a significantly easier and less demanding option. Hundreds of thousands of homeowners in the United States have allowed JPM to purchase force-placed flood insurance on their property since 2008 alone, resulting in tens of millions of dollars in commissions being paid to Chase Insurance.

(g)    JPM's exclusive purchase arrangement and kickback scheme artificially inflates the price of force-placed insurance and artificially increases commissions paid to JPM's captive insurance agent. The artificially inflated price of ASIC's force-placed insurance is only possible because JPM refers 100% of its force-placed insurance business to ASIC. As one of the nation's largest mortgagees and mortgage servicers, JPM's exclusive force-placed insurance referrals can and do substantially affect competitive incentives to reduce prices. This guarantees distorted commissions to Chase Insurance, whose commissions are a percentage of ASIC's inflated premiums.

131. Plaintiffs' experiences epitomize the anti-competitive effect JPM's practices have:

(a)    Defendants demanded that Plaintiffs increase their flood insurance coverage, and Ruth Gordon immediately sought to do so. Plaintiffs ultimately obtained a private flood insurance policy, which cost them an additional $258 in premiums and included both additional building insurance and additional contents coverage.

(b)     However, Defendants force-placed Plaintiffs into a flood insurance policy provided by ASIC. This force-placed policy provided more limited coverage with no contents coverage at an annual premium of $549, more than twice as much as Plaintiffs paid for their private policy.

(c)     Chase Insurance provided no services to Plaintiffs—in fact, absent discovery in this litigation, Plaintiffs would not even be aware that Chase Insurance exists—but still received 10% of the premium for the force-placed policy.

(d)     Plaintiffs did not have an escrow account, but Defendants established an escrow account for Plaintiffs for the sole purpose of paying flood insurance premiums to ASIC and commissions to Chase Insurance, and applied Plaintiffs' mortgage payments to the escrow account to pay flood insurance premiums to ASIC and commissions to Chase Insurance.

(e)     Although Defendants returned a portion of the commission paid to Chase Insurance, Chase Insurance retained part of it after Defendants' unilateral determination that part of the insurance premium was "earned."

132.    The "tied product" in this arrangement is Chase Insurance's "service" of acting as an insurance agent for force-placed insurance.

133.    The "tying product" is (1) Defendants' service of purchasing insurance on borrowers' behalf, (2) the initial extension of credit, and (3) JPM's continuing extension of credit.

134.    JPM ties the procurement of insurance on borrowers' behalf to Chase Insurance's "service" as alleged above.

135.    Paragraph 5 of Plaintiffs' mortgage states that the lender (JPM) "may purchase [force-placed] insurance from or through any company acceptable to Lender including, without limitation, an affiliate of Lender, and…Lender's affiliate may receive consideration for such purchase….Any amounts disbursed by Lender under this Section

35

5 shall become additional debt of Borrower secured by this Security Instrument." The initial extension of credit is conditioned on Plaintiffs agreeing to Chase Insurance acting as an insurance agent for force-placed insurance.

136. Paragraph 22 of Plaintiffs' mortgage allows JPM to rescind its extension of credit and foreclose on Plaintiffs' property if Plaintiffs fail to pay commissions to Chase Insurance that JPM determines Chase Insurance earns. The continuing extension of credit is conditioned on Plaintiffs agreeing to accept Chase Insurance as the insurance agent for force-placed insurance and pay any commissions JPM determines are owed.

137. JPM benefits directly and indirectly from this tying arrangement. On information and belief, commissions paid to Chase Insurance are remitted directly to JPM in the form of "soft dollar" transactions, whereby Chase Insurance's compensation for services provided to JPM is reduced by the amount of commissions received by Chase Insurance. Moreover, JPM receives an indirect benefit when Chase Insurance's profits are remitted to J.P. Morgan Chase & Co., which provides increased capital investments and other monetary benefits to JPM.

138. Plaintiffs and members of the Class have been damaged by JPM's anti-competitive tying arrangement in that they have paid excessive commissions to J.P. Morgan Chase & Co.'s subsidiary, Chase Insurance.

139. 12 U.S.C. § 1975 states "[a]ny person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent". Section (e) of the Bank Holding Company Act allows any person injured by an unlawful tying arrangement to file an action for actual damages, entitles such a

person to three times the actual damages sustained, and allows for the cost of the suit and attorneys' fees. Section (f) authorizes injunctive relief.

140.   Plaintiff requests that this Court find JPM in violation of 12 U.S.C. § 1972, *et seq.*

141.   Plaintiff and members of the proposed Class are entitled to three times the amount of damages sustained by them, and the cost of suit, including a reasonable attorney's fee pursuant to 12 U.S.C. §1975. Plaintiffs are further entitled to an injunction barring JPM from continuing their unlawful conduct, including their exclusive purchasing arrangement with ASIC and SGIC and kickback scheme with Chase Insurance.

## COUNT VI

## UNCONSCIONABILITY

142.   Plaintiffs' repeat all preceding paragraphs of this Second Amended Complaint.

143.   Chase's actions are unconscionable.

144.   Ruth Gordon and Anthony Arango's mortgage contains provisions concerning "lender-placed" or force-placed insurance and authorizes the lender to obtain insurance if the borrower fails to maintain adequate insurance. However, with respect to the amount of insurance, Ms. Gordon and Mr. Arango's mortgage is largely silent. What it says about the amount of insurance is limited to giving the lender discretion to set the amount and it goes on to state that such insurance "shall cover Lender."

145.   On information and belief, Ruth Gordon and Anthony Arango's mortgage is identical in all respects material to this case to all other first mortgages that Chase services.

146.   Any reasonable interpretation of these provisions leads to the conclusion that any lender-placed flood insurance policy will "cover" the lender, i.e. that it will protect the lender's interest in the property against loss by floods.

147.   However, Chase applies this language to allow it to require any amount of flood insurance, and it exercises this discretion to force-place insurance greatly in excess of the its interest in the property, which is the outstanding balance of the loan.

148.   Chase's application of this mortgage language is an unconscionable surprise.

149.   Chase's affiliates or partners charged premiums as much as four times as costly as, and substantially more limited than, flood insurance a homeowner could purchase from an independent insurance company. In a separate case in the Northern District of California, Chase's representative testified in a deposition that the premium rates charged to customers are simply not a matter of concern. Chase's affiliates received kickback commissions of 10% to 20% on these force-placed policies, which themselves amounted to almost the fair market value of equivalent insurance policies offered by other insurers. Chase's parent company and subsidiaries also benefit because they own a significant percentage of the parent company of ASIC, the company Chase used to force-place flood insurance policies.

150.   Chase withdrew ASIC's premiums and its sister companies' brokerage commissions directly from mortgage borrowers' escrow accounts. In doing so, the

premiums and other fees became a part of the customers' loan obligations. Failure to pay these premiums and commissions would result in negative credit reporting in the event of delinquency, and foreclosure in the event of default on paying such premiums and commissions.

151.   The above described facts render Chase's actions substantively unconscionable because Class Members are required to obtain far more insurance than they could be required to maintain under federal law. Chase's practices under the mortgage contract are so abusive and unfair as to shock the conscience. Chase's actions are procedurally unconscionable because they give the borrower no opportunity to prove that their existing coverage is sufficient to cover Chase's interests in their property. Instead, borrowers are required to prove that they have whatever amount of insurance Chase demands or face force-placement in a policy that charges more than twice the market rate.

152.   Chase's conduct is procedurally unconscionable as described above. Further, the disparity in means and bargaining power leaves Class Members obtaining loans from Chase no real option regarding the language of the loan or Chase's purchases or policies during the life of the loan.

153.   Chase's conduct is substantively unconscionable as described above.

154.   The imposition of additional unnecessary flood insurance when customers already have flood insurance exceeding either the outstanding balance on their loan or the replacement cost of their home is itself unconscionable and has caused Plaintiffs and class members to suffer damages.

155.   The provision in Plaintiffs' mortgage addressed in Count IV hereinabove is also unconscionable for the reasons addressed in Count IV and hereinabove.

156.   For their cause of action under the doctrine of unconscionabilty as set forth herein, Plaintiffs do not pray for monetary damages but, rather, for the Court to remedy the wrong by limiting the application of the unconscionable mortgage provisions by restricting Chase to require only an amount of insurance coverage that is required by law, and nothing more.

## COUNT VII

## VIOLATIONS OF THE TRUTH IN LENDING ACT (15 U.S.C. § 1601 *et seq.*)

157.   Plaintiffs repeat all preceding paragraphs of this Second Amended Complaint.

158.   Plaintiffs' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

159.   Chase is a "creditor" as defined by the Truth in Lending Act (TILA) because it owned Ms. Gordon's and Mr. Arango's mortgage and changed the terms of that mortgage so as to create a new mortgage obligation, of which Chase was the creditor. Alternatively, Chase is the "assignee" of Ms. Gordon's and Mr. Arango's mortgage as defined 15 U.S.C. § 1641.

160.   The inaccuracy on the face of Ms. Gordon's and Mr. Arango's TILA disclosures is apparent on the face of the disclosures because:

(1)     the inaccuracy arose out of Chase unilaterally changing the terms of Plaintiffs' loan;

(2)     anti-coercion disclosures included with Plaintiffs' mortgage explicitly stated that the lender was prohibited from conditioning its extension of credit on the borrowers purchasing any insurance product from the lender or its affiliates;

(3)     the force-placed insurance disclosure included with Plaintiffs' mortgage specifically stated that force-placed insurance would only be obtained in the amount "required" by the lender "to protect its interest in the property[,]" and;

(4)     the Notice to Borrower of Special Flood Hazard Area included with Plaintiffs' mortgage states that the borrower must purchase flood insurance at least equal to the lesser of $250,000 or the borrower's loan amount.

161.    Chase was required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

162.    Chase violated 12 C.F.R. § 226.17(c) by (i) failing to clearly, fully, and accurately disclose its flood insurance requirements in its mortgages; (ii) misrepresenting in its flood insurance notices that Plaintiffs were obligated by federal law to maintain flood insurance in amounts greater than required by federal law, and greater than necessary to protect its interest in the property securing the mortgages; and (iii) failing at all times to disclose the amount and nature of the "commission" Chase's affiliates would receive for the purchase of flood insurance.

163.   When Chase changed the terms of Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of Chase's interests in the property, it created a new debt obligation, requiring a new set of disclosures showing the amount of the flood insurance premiums (i.e. finance charges) and all components thereof. Chase has never disclosed the amount of Chase Insurance's "commissions" to its borrowers.

164.   Chase violated the TILA by adversely changing the terms of Plaintiffs' loans after origination in order to allow a Chase affiliate—Chase Insurance, a subsidiary of Chase's holding company—to receive a kickback on force-placed flood insurance premiums. These kickbacks are not authorized in the mortgage in any clear and unambiguous way.

165.   Chase also violated the TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

166.   Plaintiffs first received notice from Chase that Chase changed the terms of their mortgage on April 22, 2011.

167.   Plaintiffs received notices falsely stating federal flood insurance requirements on April 22, 2011, May 13, 2011, July 8, 2011, and July 15, 2011.

168.   All acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this case and this Second Amended Complaint, so this claim is timely.

169.   To the extent any TILA violations are construed to relate back to the time of loan origination, Plaintiffs have been unable to discover Chase's TILA violations

because Chase did not previously misrepresent federal flood insurance requirements, never represented that its affiliate would receive unearned kickbacks, and did not previously require more flood insurance than the principal balance of Plaintiffs' loan. Plaintiffs' claims are subject to equitable tolling.

170.   Chase systematically engaged in violations of the TILA to the detriment of all members of the class. Chase's actions violated 12 C.F.R. § 226.17(c) (requiring full and accurate disclosure of loan terms), 15 U.S.C. § 1639(b)(2)(a) (requiring creditors of high cost mortgages to issue new disclosures after changing the terms of credit) with respect to borrowers with high cost mortgages, 12 C.F.R. § 226.31 (setting up general requirements for high cost mortgages) with respect to class members with high cost mortgages, 12 C.F.R. § 226.31(c)(1)(i) (requiring new disclosures if the creditor changes any term that makes the original disclosures inaccurate for high cost mortgages) with respect to borrowers with high cost mortgages, 12 C.F.R. § 226.32 (laying out detailed requirements for high cost mortgages, and specifically requiring disclosure of insurance premiums) with respect to Class members with high cost mortgages, 12 C.F.R. § 226.17 (providing general disclosure requirements for all forms of credit), 12 C.F.R. § 226.17(e) (requiring new disclosures if a disclosure becomes inaccurate because of an event after the initial disclosures), 12 C.F.R. § 226.18 (describing the content of required disclosures), 12 C.F.R. § 226.19 (providing required disclosures for mortgages subject to the Real Estate Settlement Procedures Act), 12 C.F.R. § 226.21 (requiring creditors to credit overpayments to borrowers' accounts and return overpayments to borrowers), 15 U.S.C. § 1604 (setting out disclosure guidelines and deferring to the Board's regulations for establishing specific disclosure

requirements), 15 U.S.C. § 1605 (explaining the calculation of finance charge), 15 U.S.C. § 1605(c) (requiring a creditor to clearly set forth the cost of obtaining "damage and liability insurance premiums" through the creditor), 15 U.S.C. § 1631 (mandating disclosures by creditors to consumers), 15 U.S.C. § 1632 (defining required disclosures), 15 U.S.C. § 1638 (detailing disclosures required for credit plans that are not open end credit plans), and 15 U.S.C. § 1639 (describing disclosures required for high cost mortgages) for class members with high cost mortgages.

171.   Plaintiffs and members of the class have been injured and have suffered a monetary loss arising from Chase's violations of the TILA.

172.   As a result of Chase's TILA violations, Plaintiffs and members of the class are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

173.   Plaintiffs and members of the classes are also entitled to recovery of attorneys' fees and costs to be paid by Chase, as provided by 15 U.S.C. § 1640(a)(3).

## VII.   DAMAGES

174.   Defendants should pay damages to the class in an amount to be determined after trial by jury, but in any event, in excess of five million dollars ($5,000,000).

## VIII.   INJUNCTIVE RELIEF

175.   Defendants should be enjoined from: requiring borrowers to obtain flood insurance in amounts exceeding what is required to protect the lender's interest in the collateral property and, in any event, any amount in excess of that allowed by federal law; from sending notices to borrowers tending to mislead borrowers into believing that

flood insurance amounts requested by Chase are required by federal law or the mortgages when that is not the case; from continuing its exclusive purchasing arrangement with ASIC; from enabling kickbacks to Chase or its affiliate; and from force-placing flood insurance with Chase's or its holding company's subsidiaries, partners, or affiliates.

## IX.   DEMAND FOR JURY TRIAL

176.   Plaintiffs, on behalf of themselves and all others similarly situated, demand trial by jury on all issues so triable.

WHEREFORE, Plaintiffs pray that this Court certify this case as a class action and allow Plaintiffs to pursue the claims and relief described hereinabove on behalf of themselves and all others similarly situated; that the Court certify the two classes identified above; that Plaintiffs be awarded the maximum amount of damages allowed by applicable law; pre-judgment interest; for a trial by jury on all issues so triable; for attorneys' fees, costs, and all other appropriate relief.

**Dated: March 16, 2012**              Respectfully Submitted,
                                       **Attorneys for Plaintiffs**

                                       /s/ Jason Whittemore
                                       Jason Whittemore (FL Bar No. 0037256)
                                       Kevin McLaughlin (FL Bar No. 0085928)
                                       Wagner, Vaughan & McLaughlin, P.A.
                                       601 Bayshore Boulevard, Suite 910
                                       Tampa, FL 33606
                                       Telephone: (813) 225-4000
                                       Facsimile: (813) 225-4010
                                       jason@wagnerlaw.com
                                       kevin@wagnerlaw.com

                                       Alexander P. Owings (FL Bar No. 0093797)
                                       Owings Law Firm
                                       1400 Brookwood Drive
                                       Little Rock, AR 72202

Telephone: (501) 661-9999
Facsimile: (501) 661-8393
apowings@owingslawfirm.com

Russell D. Carter, III (AR Bar No. 2006039)
CARTER WALKER PLLC
2171 West Main, Suite 200
P.O. Box 628
Cabot, AR 72023
Telephone: (501) 605-1346
Facsimile: (501) 605-1348
dcarter@carterwalkerlaw.com

Jack Wagoner, III (AR Bar No. 89096)
WAGONER LAW FIRM, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
Telephone: (501) 663-5225
Facsimile: (501) 660-4030
jack@wagonerlawfirm.com

## CERTIFICATE OF SERVICE

I, Jason Whittemore, do hereby certify that on this 16 day of March, 2012, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following counsel via the CM/ECF system:

Michele L. Stocker
Cory W. Eichhorn
**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL  33301
stockerm@gtlaw.com
eichhorn@gtlaw.com

LeAnn Pedersen Pope
Stephen R. Meinertzhagen
Sara Youn
Shana Shifrin
**BURKE, WARREN, MACKAY & SERRITELLA, P.C.**
330 North Wabash Avenue, 22nd Floor
Chicago, IL  60611
lpope@burkelaw.com
smeinertzhagen@burkelaw.com
syoun@burkelaw.com

sshifrin@burkelaw.com

/s/ Jason Whittemore_____